# In the United States Court of Federal Claims

No. 10-420C
(Filed: December 19, 2017)

```
*****************************
CLEAR CREEK COMMUNITY        *
SERVICES DISTRICT,           *    RCFC 59; Motion for Reconsideration;
                             *    Principles of Contract Interpretation;
             Plaintiff,      *    Ambiguities; Mutuality of Consideration;
                             *    Perpetuity; Extrinsic Evidence; Parol
v.                           *    Evidence Rule; Surplusage
                             *
THE UNITED STATES,           *
                             *
             Defendant.      *
*****************************
```

Walter Patterson McNeill, Redding, CA, for plaintiff.

Igor Helman, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Before the court is plaintiff's motion for reconsideration of the court's May 17, 2017 opinion and order granting in part and denying in part defendant's combined motion to dismiss pursuant to Rules 12(b)(1) and (6) of the Rules of the United States Court of Federal Claims ("RCFC") and motion for summary judgment pursuant to RCFC 56. See Clear Creek Cmty. Servs. Dist. v. United States, 132 Fed. Cl. 223 (2017). Plaintiff, Clear Creek Community Services District ("plaintiff" or "the District"), is a local government agency that provides water service to the Clear Creek watershed, which is located in Shasta County, California. Second Am. Compl. ¶¶ 2, 5. Defendant is the United States, acting through the United States Department of the Interior's Bureau of Reclamation ("BOR"). The court deems oral argument unnecessary and, for the reasons set forth below, denies plaintiff's motion.

## I. BACKGROUND

Plaintiff's Second Amended Complaint contains three counts. In Count I, "Breach of Contract for [Operation & Maintenance ("O&M")] and Water Service and Delivery," plaintiff claims that defendant breached its contractual obligation to make certain repairs to the conduit and to deliver water. Id. ¶ 32. In its May 17, 2017 opinion and order, the court found that it was unable to determine whether one of plaintiff's breach-of-contract claims included in Count I was timely under the Tucker Act's six-year statute of limitations. Clear Creek, 132 Fed. Cl. at 249-

50.  Specifically, the court held that there was "a genuine issue of material fact as to whether plaintiff knew or should have known that vertical drain pipes were installed even though the construction specifications called for horizontal drain pipes." Id. at 250.  With respect to plaintiff's remaining breach-of-contract claims, the court found that they were untimely.  Id. at 263.  The court therefore concluded, with respect to Count I, that (1) it was unclear whether the court had subject matter jurisdiction over plaintiff's vertical versus horizontal drain pipe claim and (2) the court lacked "subject matter jurisdiction over plaintiff's remaining breach-of-contract claims."  Id.

In Count II, "Inverse Condemnation," plaintiff claims that it has "a vested and valuable compensable property interest in its rights to receive annually up to 15,300 acre feet of water that it can treat and serve to its customers for domestic [municipal and industrial] use," and that defendant refuses to recognize plaintiff's property interest.  Second Am. Compl. ¶ 55.  In Count III, "Declaratory Relief," plaintiff seeks a declaration from the court that defendant is obligated to operate and maintain the conduit, and that defendant cannot deprive plaintiff of its "interest and entitlement to the water under its long term water service contract in contravention of the intent and terms of the contract as well as state laws that control policy implementation of shortage allocations of water."  Id. ¶ 63.  In its May 17, 2017 opinion and order, the court found that there were "no genuine issues of material fact and that defendant [was] entitled to a judgment as a matter law with respect to plaintiff's Fifth Amendment takings claim [(Count II)] and plaintiff's request for declaratory relief [(Count III)]."  In its motion for reconsideration, plaintiff contends that the court improperly dismissed its breach of contract claims under Count I.  Defendant opposes plaintiff's motion.

## II.  STANDARD OF REVIEW

A motion for reconsideration is a request for "extraordinary" relief and is not an avenue for a dissatisfied party to simply relitigate the case.  Caldwell v. United States, 391 F.3d 1226, 1235 (Fed. Cir. 2004); accord Four Rivers Invs., Inc. v. United States, 78 Fed. Cl. 662, 664 (2007); Fru-Con Constr. Corp. v. United States, 44 Fed. Cl. 298, 300 (1999), aff'd per curiam, 250 F.3d 762 (Fed. Cir. 2000) (unpublished table decision).  Thus, such a motion does not allow a party to raise arguments that it failed to raise previously or reassert arguments that have already been considered.  Four Rivers Invs., 78 Fed. Cl. at 664.  However, pursuant to RCFC 59(a)(1), the court "may grant a motion for reconsideration when there has been an intervening change in the controlling law, newly discovered evidence, or a need to correct clear factual or legal error or prevent manifest injustice."  Biery v. United States, 818 F.3d 704, 711 (Fed. Cir. 2016) (internal quotation marks omitted).  A decision on a motion for reconsideration is within the discretion of the trial court.  See Entergy Nuclear FitzPatrick, LLC v. United States, 711 F.3d 1382, 1386 (Fed. Cir. 2013) (explaining that a decision on a motion for reconsideration is reviewed on appeal for abuse of discretion).

### III. DISCUSSION

### A. Principles of Contract Interpretation

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989); see also Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1325 (1997) ("To prevail, [plaintiff] must allege facts showing both the formation of an express contract and its breach."). Thus, the first step is to define the terms of the contract.

"Contract interpretation is a question of law," Lucent Techs., Inc. v. Gateway, Inc., 543 F.3d 710, 717 (Fed. Cir. 2008); accord Winstar Corp. v. United States, 64 F.3d 1531, 1540 (Fed. Cir. 1995) (en banc), aff'd, 518 U.S. 839 (1996), and is therefore "generally amenable to summary judgment," Varilease Tech. Grp., Inc. v. United States, 289 F.3d 795, 798 (Fed. Cir. 2002) (citing Textron Def. Sys. v. Widnall, 143 F.3d 1465, 1468 (Fed. Cir. 1998)). See also NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("Whether a contract provision is ambiguous is . . . a question of law," as is "[w]hether an ambiguity is patent or latent."). "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." Lynch v. United States, 292 U.S. 571, 579 (1934). As such, "to resolve the current dispute, the court must identify and apply 'principles of general contract law.'" Praecomm, Inc. v. United States, 78 Fed. Cl. 5, 10 (2007) (quoting Franconia Assocs. v. United States, 536 U.S. 129, 141 (2002)).

The court applies "three primary rules of contract interpretation." Enron Fed. Sols., Inc. v. United States, 80 Fed. Cl. 382, 393 (2008). First, contract interpretation "begins with the language of the written agreement." NVT Techs., Inc., 370 F.3d at 1159; see also Enron Fed. Sols., Inc., 80 Fed. Cl. at 393 (stating that contract interpretation "start[s] with the plain meaning of the Contract's text"). A contract "is read in accordance with its express terms and the plain meaning thereof," C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1543 (Fed. Cir. 1993); accord U.S. Sur. Co. v. United States, 83 Fed. Cl. 306, 311 (2008), and these terms are accorded "their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning," Harris v. Dep't of Veterans Affairs, 142 F.3d 1463, 1467 (Fed. Cir. 1998). The contract language "'must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances,'" Metric Constructors, Inc. v. NASA, 169 F.3d 747, 752 (Fed. Cir. 1999) (quoting Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 975 (Ct. Cl. 1965)), and "any subjective, unexpressed intent of one of the parties is ineffective," Sterling, Winchester & Long, L.L.C. v. United States, 83 Fed. Cl. 179, 183 (2008).

Second, the court applies the "settled principle[] of contract interpretation," Dalton v. Cessna Aircraft Co., 98 F.3d 1298, 1305 (Fed. Cir. 1996), that a contract "be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts," NVT Techs., Inc., 370 F.3d at 1159. Such an interpretation "is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous." Id. (citing Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991)); see also United Int'l Investigative Serv. v.

United States, 109 F.3d 734, 737 (Fed. Cir. 1997) (stating that the interpretation of a contract must "avoid[] conflict or surplusage of its provisions").

Third, "[t]he mere fact that the parties disagree with regard to the interpretation of a specific provision, does not, standing alone, render that provision ambiguous." Enron Fed. Sols., Inc., 80 Fed. Cl. at 393; see also Metric Constructors, Inc., 169 F.3d at 751 ("To show an ambiguity[,] it is not enough that the parties differ in their respective interpretations of a contract term.").

### 1. Unambiguous Contract Provisions

When a contract term is "clear and unambiguous on its face, the plain and ordinary meaning of the contract controls . . . ." Sterling, Winchester & Long, L.L.C., 83 Fed. Cl. at 183. As such, the court "cannot assign it another meaning, no matter how reasonable that other meaning might seem to be." Triax Pac., Inc. v. West, 130 F.3d 1469, 1473 (Fed. Cir. 1997). Thus, when the court encounters unambiguous contract terms, "extrinsic evidence is inadmissible to interpret them." Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004); see also Barseback Kraft AB v. United States, 121 F.3d 1475, 1479 (Fed. Cir. 1997) (stating that courts will give clear and unambiguous contract provisions "their plain and ordinary meaning and will not resort to parol evidence"). "To permit otherwise," the United States Court of Appeals for the Federal Circuit ("Federal Circuit") cautioned, "would cast 'a long shadow of uncertainty over all transactions' and contracts." McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (quoting Trident Ctr. v. Conn. Gen. Life Ins. Co., 847 F.2d 564, 569 (9th Cir. 1988)).

### 2. Ambiguous Contract Provisions

By contrast, a contract provision is ambiguous "only . . . if [it is] susceptible to more than one reasonable meaning," Barron Bancshares, Inc., 366 F.3d at 1375-76, and each meaning "is found to be consistent with the contract language," Enron Fed. Sols., Inc., 80 Fed. Cl. at 394. In other words, differing interpretations "must fall within a 'zone of reasonableness.'" Metric Constructors, Inc., 169 F.3d at 751. Where the contract language is ambiguous, disputed issues of fact may arise concerning the parties' intent. Perry-McCall Constr., Inc. v. United States, 46 Fed. Cl. 664, 672 (2000).

"Ambiguities in a government contract are normally resolved against the drafter." Triax Pac., Inc., 130 F.3d at 1474. As the Federal Circuit stated in Turner Construction Co. v. United States, 367 F.3d 1319, 1321 (Fed. Cir. 2004), "[w]hen a dispute arises as to the interpretation of a contract and the [private contracting party's] interpretation of the contract is reasonable, we apply the rule of contra proferentem, which requires that ambiguous or unclear terms that are subject to more than one reasonable interpretation be construed against the party who drafted the document." See also United States v. Seckinger, 397 U.S. 203, 216 (1970) ("[A]s between two reasonable and practical constructions of an ambiguous contractual provision . . . the provision should be construed less favorably to that party which selected the contractual language."), quoted in Stathis v. United States, 120 Fed. Cl. 552, 563 (2015). However, there is an exception to this rule, depending upon the type of ambiguity contained in the contract. Triax Pac., Inc.,

130 F.3d at 1474. "In order to decide how to apply the doctrine of contra proferentem, after a court finds contract terms to be ambiguous and 'susceptible to more than one reasonable interpretation,' the court must first determine whether the ambiguity is latent or patent." Burchick Constr. Co. v. United States, 83 Fed. Cl. 12, 19 (2008) (quoting E.L. Hamm & Assocs., Inc. v. England, 379 F.3d 1334, 1341 (Fed. Cir. 2004)); accord Metric Constructors, Inc., 169 F.3d at 751 ("If [the] court interprets the contract and detects an ambiguity, it next determines whether that ambiguity is patent.").

### a. Patent Ambiguities

A patent ambiguity is one that is "obvious, gross, [or] glaring, so that [the] plaintiff contractor had a duty to inquire about it at the start." H & M Moving, Inc. v. United States, 499 F.2d 660, 671 (Ct. Cl. 1974). It is "an obvious omission, inconsistency, or discrepancy of significance," Beacon Constr. Co. of Mass. v. United States, 314 F.2d 501, 504 (Ct. Cl. 1963), or "an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap," WPC Enters., Inc. v. United States, 323 F.2d 874, 876 (Ct. Cl. 1963). A patent ambiguity "exists where there is a facial inconsistency between provisions or terms within the contract." Travelers Cas. & Sur. Co. of Am. v. United States, 75 Fed. Cl. 696, 711 (2007). Thus, a patent ambiguity "should be, to the reasonable [contracting party], apparent on the face of the contract . . . ." Id.; accord P.R. Burke Corp. v. United States, 277 F.3d 1346, 1355 (Fed. Cir. 2002) (indicating that a patent ambiguity appears "on the face of the contract").

The United States Court of Claims, the predecessor to the Federal Circuit, described the inquiry into whether an ambiguity is patent as "not a simple yes-no proposition[,] but [one] involv[ing] placing the contractual language at a point along a spectrum:  Is it so glaring as to raise a duty to inquire?" Newsom v. United States, 676 F.2d 647, 650 (Ct. Cl. 1982); see also Jaynes v. United States, 75 Fed. Cl. 218, 235 (2007) ("What constitutes a patent ambiguity must be determined 'on an ad hoc basis by looking to what a reasonable man would find to be patent and glaring.'" (quoting L. Rosenman Corp. v. United States, 390 F.2d 711, 713 (Ct. Cl. 1968))). "The doctrine of patent ambiguity is an exception to the general rule of contra proferentem[,] which construes an ambiguity against the drafter . . . ." Metric Constructors, Inc., 169 F.3d at 751. Thus, a patent ambiguity "'would place the reasonable [private contracting party] on notice and prompt [that party] to rectify the inconsistency by inquiring of the appropriate parties.'" Metcalf Constr. Co. v. United States, 53 Fed. Cl. 617, 630 (2002) (quoting Nielsen-Dillingham Builders, J.V. v. United States, 43 Fed. Cl. 5, 11 (1999)); see also Fortec Constructors v. United States, 760 F.2d 1288, 1291 (Fed. Cir. 1985) (stating that the existence of a patent ambiguity "raises the duty of inquiry, regardless of the reasonableness of the [private contracting party's] interpretation").

### b. Latent Ambiguities

By contrast, a latent ambiguity is a "hidden or concealed defect which is not apparent on the face of the document, could not be discovered by reasonable and customary care, and is not so 'patent and glaring as to impose an affirmative duty on plaintiff to seek clarification.'" Diggins Equip. Corp. v. United States, 17 Cl. Ct. 358, 360 (1989) (quoting Avedon Corp. v. United States, 15 Cl. Ct. 771, 777 (1988)). A latent ambiguity "arises only once the contract is

applied," Travelers Cas. & Sur. Co. of Am., 75 Fed. Cl. at 711, and "generally becomes evident, when, 'considered in light of the objective circumstances, two conflicting interpretations appear reasonable,'" Input/Output Tech., Inc. v. United States, 44 Fed. Cl. 65, 72 n.10 (1999) (quoting Cray Research, Inc. v. United States, 41 Fed. Cl. 427, 435 (1998)). "[T]he general rule of contra proferentem controls" with regard to latent ambiguities. Burchick Constr. Co., 83 Fed. Cl. at 20. Thus, the doctrine of contra proferentem "places the risk of latent ambiguity, lack of clarity, or absence of proper warning on the drafting party." Id. This doctrine, however, is applied by courts

> only when other approaches to contract interpretation have failed. Accordingly, our predecessor court held that 'if an ambiguity cannot be cleared up by reading the contract as a whole or looking to the circumstances attending the transaction and the conduct of the parties, the ambiguity should be resolved against the party who drafted the contract.'

Gardiner, Kamya & Assocs., P.C. v. Jackson, 467 F.3d 1348, 1352 (Fed. Cir. 2006) (quoting Chris Berg, Inc. v. United States, 455 F.2d 1037, 1044 (Ct. Cl. 1972)).

The determination that an ambiguity is latent, however, does not necessarily result in the court adopting the plaintiff's interpretation. Cmty. Heating & Plumbing v. Kelso, 987 F.2d 1575, 1579 (Fed. Cir. 1993). Rather, the court adopts the plaintiff's interpretation of a latent ambiguity only if it is reasonable. Id. Thus, "[i]f the ambiguity . . . is latent, and plaintiff's interpretation is reasonable, plaintiff will prevail over an equally reasonable interpretation by defendant." Diggins Equip. Corp., 17 Cl. Ct. at 360; accord Alliant Techsys., Inc. v. United States, 74 Fed. Cl. 566, 577 (2007) ("The Court will adopt a contractor's reasonable interpretation of a latent ambiguity under the contra proferentem rule—construing an ambiguity against the drafter. . . . If the contractor's interpretation of such a contract provision is determined to be reasonable, . . . the contractor will prevail against the author of the contract." (citations omitted)).

### 3. Absence of Contract Provisions

Of course, if a contract is a silent with respect to a particular issue, it may not be that the contract is ambiguous as to that issue. For example, in Gardiner, Kamya & Assocs., P.C., 467 F.3d at 1353-54, the Federal Circuit found that, when considered as a whole, the language of the contract at issue was not ambiguous. Specifically, the court concluded that "[t]he phrase '[s]uch prices shall remain in effect pending results of the audit and subsequent negotiations of the unit prices' does not in any way state or suggest a retroactive pricing arrangement, and we may not 'convert an agreement's utter silence on an issue into contractual ambiguity.'" Id. (quoting New Jersey v. New York, 523 U.S. 767, 783 n.6 (1998)). Similarly, in Holland v. United States, 74 Fed. Cl. 225, 263 (2006), the court held: "The contract's silence regarding the treatment of preferred stock is not an ambiguity; rather, it reflects absence of any promise, especially in light of the fact that the contract documents specifically enumerated the other regulatory capital promises."

## B. The Parties' Positions

In its motion for reconsideration, plaintiff claims that the court's May 17, 2017 decision contains mistakes of both fact and law. Pl.'s Mot. 1. First, plaintiff argues that the court failed to recognize that plaintiff's O&M duties with respect to the conduit terminated after February 28, 2005. Id. at 2-3. As a result, plaintiff contends, the court focused solely on "design/construction defects" but failed to consider the effects of "contractual termination." Id. at 3. According to plaintiff, the court "does not address the crux of Plaintiff's argument that there was no contractual duty by Plaintiff for O&M of the Conduit after February 28, 2005 and therefore damage claims from March 1, 2005 forward are not and cannot be barred." Id. at 4; accord id. at 6 ("Plaintiff was careful to file this action within 6 years of the March 1, 2005 date, the date when the United States first acquired O&M responsibility after the expiration of Plaintiff's responsibility under the prior contracts. It is not possible to apply the 6-year statute of limitations to this claim by Plaintiff.").

Second, plaintiff avers that the court erroneously "ruled in favor of the United States . . . by declaring that defects in design and construction are part of the ordinary O&M of the Conduit and [that] because Plaintiff had notice of the construction/design defects many years ago such claims are barred by the 6 year statute of limitations." Id. at 4-5. In plaintiff's view, "[i]t was and is the duty of the U.S. to fix the design/construction defects it built into its own property, regardless of whether the District subsequently operates and maintains that piece of U.S. property." Id. at 5 n.1.

Third, plaintiff contends that "[t]he architecture of the contract is comprised of pieces stuck together, rather than a harmonious whole negotiated in its entirety, and it has no provision for continuing or future O&M by Plaintiff after February 28, 2005." Id. at 6. According to plaintiff, the contract in this case is comprised of the following documents: (1) the 1963 contract; (2) the 1965 contract; (3) the letter agreement of December 14, 1971; (4) nine different "interim renewal contracts" effective January 1, 1995 through February 28, 2005; and (5) the water service contract effective March 1, 2005, through February 28, 2030. Id. Plaintiff claims that its O&M obligation terminated the day after February 28, 2005, the expiration date of the last interim renewal contract. Id. at 7. In support of its interpretation, plaintiff argues: (1) the 1963 contract contains two distinct O&M provisions—under Part A, Articles 2 and 3, plaintiff is responsible for O&M of the conduit until December 31, 1994, and under Part B, plaintiff is responsible for O&M of the distribution system until July 1, 2017, id. at 7-8; and (2) although the Central Valley Project ("CVP") Improvement Act compelled the renegotiation of virtually all CVP water service contracts, including plaintiff's, it did not impact plaintiff's O&M obligation with respect to the conduit—that obligation expired on December 31, 1994, as stated in Part A, Article 3 of the original 1963 contract, id. at 8-18.

Fourth, plaintiff suggests that "[t]he plain language of the contract compels the conclusion that plaintiff's O&M obligation terminated on the stroke of midnight February 28, 2005," the date the last interim renewal contract expired. Id. at 18. In other words, plaintiff argues that because the parties were unable to agree to any further renewal contracts, the terms of the original 1963 contract (which, according to plaintiff, provided that plaintiff's O&M

-7-

obligation for the conduit ended on December 31, 1994) once more became controlling. Id. at 18-19.

Fifth, plaintiff avers that the court erroneously "conflat[es] the final language of Article 39 of the long term renewal contract with the language used in the interim renewal contracts." Id. at 19. Specifically, plaintiff takes issue with the court's characterization of the 2005 long-term contract as being "like the interim contracts." Id. at 20. According to plaintiff, whereas the interim contracts provided that "[t]he respective duties, covenants, and obligations of the parties in [the 1963 contract] which are not replaced by this Contract shall continue in full force and effect," the 2005 contract provided that "[t]he respective duties, covenants, and obligations of the parties in [the 1963 contract] which are not replaced by this Contract shall be unaffected as if Part A had not been replaced." Id. (internal quotation marks omitted). In addition, plaintiff faults the court for omitting the phrase "as if Part A had not been replaced" from its excerpt from the 2005 long-term contract. Id. Plaintiff concludes:

> The Court's ruling blithely treats pertinent language in Article 35 of the nine Interim Renewal contracts and Article 39 of the Long Term Renewal water contract as all being the same, and seemingly inconsequential. The ruling then proceeds to ignore the issue and Plaintiff's claim that it had no O&M obligation after February 28, 2005, as if the issue never existed. Plaintiff deserves its day in court.

Id.

Lastly, plaintiff makes three final points in support of its position that plaintiff's obligation for O&M of the conduit terminated the day after February 28, 2005: (1) plaintiff argues that defendant's position—that plaintiff's obligation for O&M of the conduit continues in perpetuity "(a) has no foundation in the contract language[;] (b) violates the contract formation principle of certainty of essential terms, one of which is the duration of performance of a contract[;] (c) violates the contract formation principle of 'consideration' in that no consideration or value supports the purported obligation of forever O&M[;] and (d) violates the contract interpretation principle that the court should avoid interpretations that—in the absence of definitive written terms—are irrational or absurd," id. at 21; (2) plaintiff argues that further support for its position can be found in a letter dated May 25, 1989, wherein the Assistant Regional Director of the BOR's Mid-Pacific Region stated his belief "that Clear Creek w[ould] continue to O&M the Conduit through the term of their existing contract, that is through 1994," id. at 21-22; and (3) plaintiff argues that it would make no sense for defendant to participate in two days of negotiations (in the spring of 2004 and on June 15, 2004) on the issue of plaintiff's obligation for O&M of the conduit if that obligation already existed, id. at 13, 22.

In its response to plaintiff's motion for reconsideration, defendant contends that the court did in fact address plaintiff's O&M obligation. Def.'s Resp. 11-12. First, defendant notes that the court acknowledged plaintiff's explanation "'as to why each of [plaintiff's] defective design/construction claims should not be viewed as O&M claims,'" id. at 11 (quoting Clear Creek, 132 Fed. Cl. at 246), and that the court was entitled to take plaintiff at its word, Def.'s Resp. 11. Second, defendant notes that because plaintiff's claims are based on specific defects in

-8-

the design and construction of the conduit, it was appropriate for the court to "refrain from entering a declaratory judgment regarding operation and maintenance obligations in the abstract." Id. at 12.

Next, defendant avers that "[e]ven if this Court did not expressly conclude that [plaintiff's] operation and maintenance obligations under the 1963 Contract continued past December 31, 1994 (and past March 1, 2005), such a conclusion was implicit in the Court's Order." Id. at 13. According to defendant, the plain language of the 1963 contract supports the court's conclusion: (1) Article 3 provides that at some point during the term of Part A of the contract, defendant would notify plaintiff as to when O&M of the conduit would be transferred from defendant to plaintiff; (2) Article 2 provides that the term of Part A only relates to the furnishing of water; (3) Article 16 provides that plaintiff agrees (pursuant to Articles 3 and 15) to accept the care and O&M of the conduit without expense to defendant for an unspecified period of time and that defendant reserves the right to take back O&M of the conduit should plaintiff fail to maintain it in good and efficient condition in compliance with applicable federal laws and the terms of the 1963 contract; and (4) Article 18 provides that if defendant does resume O&M of the conduit pursuant to Article 16, plaintiff must pay defendant for the cost of such services. Id. at 13-14.

Defendant also points to the language in the 1963 contract's explanatory recitals as further support for its contention that defendant never intended to pay for O&M of the conduit after that obligation was transferred to plaintiff. Id. at 14. According to defendant, that language clearly expresses the parties' intent that defendant would build the conduit and that plaintiff would both reimburse defendant for the cost of construction and thereafter assume the obligation for O&M of the conduit. Id.; accord id. at 15-16 (discussing the parties' intent that plaintiff operate and maintain both the conduit and the distribution system in perpetuity).

Lastly, defendant contends that because the contract terms are unambiguous, plaintiff may not introduce extrinsic evidence in support of its position. Id. at 16. Specifically, defendant refers to plaintiff's reliance on the negotiation history of the interim contracts (appearing at pages nine through eighteen of plaintiff's motion) as well as plaintiff's reliance on a June 4, 2004 letter from plaintiff's counsel to defendant (appearing at pages fifteen to seventeen of plaintiff's motion). Id. Alternatively, defendant argues that even if the court were to conclude that the language of the 1963 contract was ambiguous, "any such ambiguity would have been glaring, obligating [plaintiff] to seek clarification." Id. at 16-17. In defendant's view, the critical language, which appears in Article 2 of the 1963 contract and states that the term of the contract is limited "only '[i]nsofar as it relates to the furnishing of water,'" id. at 17 (quoting Article 2 of the 1963 contract), was "apparent from the face of the document," Def.'s Resp. 17, and therefore plaintiff "would have had a duty to clarify the contract before entering into it," id.; see Clear Creek, 132 Fed. Cl. at 231.

In its reply brief, plaintiff vehemently disputes defendant's contention that the terms of the 1963 contract impose upon plaintiff the obligation to operate and maintain the conduit in perpetuity. Pl.'s Reply 2. First, plaintiff argues that the parties never agreed that plaintiff would reimburse defendant for the cost of constructing the conduit and that the payment provisions within Articles 12 and 13 of the 1963 contract provide that plaintiff will reimburse defendant

-9-

solely for the cost of constructing the distribution system. Id. at 4. In support of its position, plaintiff notes that the conduit was not built exclusively for plaintiff's use and that in fact, it was built to serve other jurisdictions besides plaintiff, although the parties intended for defendant to retain title and ownership of the conduit. Id. at 4-5. According to plaintiff, when the conduit is properly characterized as a "multi-jurisdictional facility, it 'makes sense' that [plaintiff] should not have an O&M obligation for the conduit beyond what it agreed to for the establishment of [the] facility." Id. at 5-6.

Next, plaintiff contends that "[t]he plain language of the 1963 contract does not place a burden on [plaintiff] to [operate and maintain] the conduit beyond the termination of that contract." Id. at 6-10. With respect to Article 2, plaintiff does not accept defendant's interpretation, which is that the termination date of December 31, 1994 (referenced therein) applies only to the furnishing of water. Id. at 6. Rather, plaintiff contends that its "O&M obligation was conjoined or in tandem with water availability," and that "[t]he termination date of December 31, 1994 was real." Id. With respect to Article 3, plaintiff avers that it limits plaintiff's obligation to operate and maintain the conduit to the "'term of part A of [the] contract.'" Id. at 7 (quoting Article 3 of the 1963 contract). With respect to Article 16, plaintiff argues that when the contract is read as a whole, the language in Articles 2 and 3 "must be given effect as a termination date for O&M responsibility." Id. at 8. According to plaintiff, it "defies common sense" to find that plaintiff agreed to assume O&M responsibility for the conduit "forever." Id. at 8-9. With respect to the entire contract, plaintiff suggests that summary judgment is not appropriate because the contract language is "reasonably susceptible to more than one interpretation" and is therefore ambiguous. Id. at 9-10 (internal quotation marks omitted).

Lastly, plaintiff states that its "claims for money damages for emergency repairs to the conduit [made] after March 1, 2005 should be allowed to proceed." Id. at 10. Specifically, plaintiff points to repairs it made to the conduit on three separate occasions as a result of leaks that were discovered in February 2007, August 2011, and September 2011. Id. Plaintiff estimates that the total cost of repairing the leaks was in excess of $75,000, and states that it would have been irresponsible for plaintiff not to perform the repairs pending the outcome of the instant lawsuit. Id.

### C. Analysis

### 1. Pursuant to the Plain Language of the Various Contracts Between the Parties, Plaintiff's Contractual Duty to Operate and Maintain the Conduit Did Not Expire on February 28, 2005

In its motion for reconsideration, not only does plaintiff contend that the court failed to treat its defective design/construction claims differently than its O&M claims, but plaintiff also contends that the court failed to address plaintiff's assertion that its O&M obligation expired on February 28, 2005:

> The contractual termination of Plaintiff's responsibility for
> O&M by virtue of the termination of the original contractual

> obligation, has nothing to do with whether repairs of defective design or defective construction of the Conduit by the United States falls into the general contractual definition of O&M as a contract term. This Court has ruled in favor of the United States on that issue by declaring that defects in design and construction are part of the ordinary O&M of the Conduit and because Plaintiff had notice of the construction/design defects many years ago such claims are barred by the 6 year statute of limitations.

Pl.'s Mot. 4-5. What plaintiff fails to appreciate, however, is that irrespective of the nature of plaintiff's claims, the court must first determine whether it has jurisdiction over them in light of the Tucker Act's six-year statute of limitations. For example, if—hypothetically speaking—plaintiff discovered leaks in the conduit pipes in 2000, yet failed to file suit until 2010, the claim would be untimely. This is true whether the leaks were caused by defendant's use of substandard piping at the time the conduit was built or the leaks were caused by a shifting of the pipes due to local seismic activity. In either scenario, the court must first address whether it possesses jurisdiction over the claims alleged. Only then can the court turn to the merits of plaintiff's claims. That said, the court did—in its previous opinion—conclude that plaintiff's contractual duty to operate and maintain the conduit did not expire on February 28, 2005.

The court's conclusion was based, as it must be, on the plain language of the 1963 contract, the 1994-2004 interim contracts, and the 2005 long-term contract.

### a. The 1963 Contract

Beginning with the express terms of the 1963 contract, the court first quoted language from the explanatory recital that precedes the main body of the contract: "[I]t is intended that the District, subject to the terms and conditions contained herein, will operate and maintain the Clear Creek South Unit and said distribution system." Clear Creek, 132 Fed. Cl. at 230. In general terms, therefore, the parties agreed that once the conduit and distribution system had been built, plaintiff would be responsible for their O&M.

Second, the court quoted language from Article 2, captioned "Effective Date of Contract—Term of Part A": "Insofar as it relates to the furnishing of water, this contract shall terminate on December 31, 1994." Id. at 231. Thus, pursuant to Article 2, the contract takes effect on May 14, 1963, "the date first hereinabove written," and "[i]nsofar as it relates to the furnishing of water," the contract terminates on December 31, 1994. Id.

Third, the court quoted language from Article 3 of Part A of the 1963 contract, captioned "Transfer of Operation and Maintenance of Project Works to the District": "[T]he Contracting Officer will furnish to the District a written notice announcing the initial delivery date and stating the time of the transfer to the District for operation and maintenance during the term of Part A of this contract of the completed Project works." Id. Thus, pursuant to Article 3, when construction of the Project Works was complete or when, in the opinion of the Contracting Officer, enough of the Project Works was complete to allow for the delivery of water, defendant would provide plaintiff with a notice stating when the delivery of water would commence. In its

-11-

opinion, the court further noted: "Thus, the contract states that during the term of Part A, plaintiff [was] to assume the operation and maintenance of the conduit following its completion." Id. In other words, the court found that at some point during the term of Part A of the contract, plaintiff was to assume O&M of the conduit.

Plaintiff argues that the term of Part A of the 1963 contract expired on December 31, 1994. Therefore, plaintiff contends that, pursuant to Articles 2 and 3, its obligation to operate and maintain the conduit, which only existed during the term of Part A of the contract, expired on December 31, 1994. The problem with plaintiff's interpretation of Articles 2 and 3 is that it is based on a faulty reading of Article 2. Article 2, which, as noted above, is captioned "Effective Date of Contract—Term of Part A," states (1) when the contract will take effect and (2) when, only "[i]nsofar as it relates to the furnishing of water," the contract will terminate. Article 2 does not address O&M of either the conduit or the distribution system. Article 3, in turn, states when water delivery will begin and when responsibility for O&M of the conduit will transfer from defendant to plaintiff. Article 3 does not state when plaintiff's O&M obligation with respect to the conduit will terminate nor when defendant's obligation to provide plaintiff with water will terminate. Notably, plaintiff's failure to address the meaning of the phrase "insofar as it relates to the furnishing of water" in its analysis is akin to rendering the phrase surplusage; such an approach cannot be countenanced. See United Int'l Investigative Serv., 109 F.3d at 737 (noting that contract interpretation must avoid rendering provisions meaningless).

Lastly, the court quoted language from Article 16, captioned "Operation, Inspection, and Retransfer of Transferred Works—United States to Be Held Harmless":

> The District agrees to accept, upon the effective date of transfer notices pursuant to Articles 3 and 15, the care, operation, and maintenance of the transferred works and thereafter, without expense to the United States, to care for, operate, and maintain them and deliver water therefrom in full compliance with the Federal reclamation laws and the terms of this contract in such a manner that said works shall remain in good and efficient condition.

Clear Creek, 132 Fed. Cl. at 231. Thus, pursuant to Article 16, plaintiff agreed to operate and maintain the conduit without any further expense to defendant. Although not noted by the court in its May 17, 2017 decision, Article 16 further provides that if defendant determines that plaintiff "has not cared for, operated, maintained, or delivered water from the transferred works as required," defendant could, after giving plaintiff timely notice, "take back and operate and maintain said works or any part thereof." Administrative R. ("A")246.[1]

Significantly, Article 16 also notes that, "while operating the transferred works," plaintiff "shall maintain and furnish to the United States during the term of Part A of this contract a

---

[1] The Administrative Record appears on the docket as attachments to Defendant's Proposed Findings of Uncontroverted Fact and as attachments to Plaintiff's Responses and Objections to Defendant's Proposed Findings of Uncontroverted Facts.

record of all the water furnished from the Project by the United States." A245.  In other words, because—pursuant to Article 2—defendant's obligation to furnish plaintiff with water terminated on December 31, 1994, plaintiff's concurrent obligation to provide defendant with a record of all of the water it received also terminated on December 31, 1994.  If the drafters of the 1963 contract intended to provide a cut-off date for plaintiff's O&M obligation with respect to the conduit, they would not have segregated plaintiff's O&M obligation from plaintiff's obligation to provide defendant with a record of the amount of water furnished during Part A of the contract.  Stated differently, Article 16 confirms that the December 31, 1994 termination date appearing in Article 2 refers solely to the provision of water from defendant to plaintiff.

In summary, when read as a whole, the 1963 contract clearly provides an end date to defendant's obligation to furnish plaintiff with water (December 31, 1994), but does not provide an end date to plaintiff's O&M obligation with respect to the conduit.  The court turns next to its assessment of the interim contracts in its May 17, 2017 decision.

### b.  The 1994-2004 Interim Contracts

As noted above, because Article 2 of the 1963 contract provides that defendant's obligation to furnish plaintiff with water expired on December 31, 1994, the parties entered into a series of interim contracts.  The following chart summarizes the court's previous description of these contracts:[2]

| Date | Period of Coverage | Reference to 1963 Contract |
|---|---|---|
| 12/28/1994 | 1/1/1995 – 12/31/1997 | Article 35:  "The parties hereto acknowledge and agree that Part A (i.e., Articles 2 through 10) of [the 1963 contract] (as amended, and as modified by the letter agreement dated December 14, 1971) is replaced by this interim renewal contract.  The respective duties, covenants, and obligations of the parties in [the 1963 contract], as amended, which are not replaced by this interim renewal contract shall continue in full force and effect, pending prompt completion of good faith negotiations between the parties to agree upon an amendatory contract." |
| A52-90 | A59 | A84 |
| 12/24/1997 | 1/1/1998 – 2/28/1998 | (Same as above) |
| A367-404 | A376 | A402-03 |
| 2/20/1998 | 3/1/1998 – 2/29/2000 | (Same as above) |

---

[2]  In its May 17, 2017 decision, the court inadvertently neglected to include a citation to the interim contract dated February 28, 2001.  Reference to that contract is made herein in the court's summary chart.

-13-

| | | |
|---|---|---|
| A409-48 | A418 | A447 |
| 2/29/2000 | 3/1/2000 – 11/30/2000 | (Same as above) |
| A456-97 | A465 | A496 |
| 11/30/2000 | 12/1/2000 – 2/28/2001 | Article 1: "The terms and conditions of the Existing Interim Renewal Contract are hereby incorporated by reference into this Contract with the same force and effect as if they were included in full text with the exception of Articles 2, 3(a), and 25 thereof, which are revised as follows . . . ." |
| A553-57 | A556 | A555 |
| 2/28/2001 | 3/1/2001 – 2/28/2002 | Article 35: "The parties hereto acknowledge and agree that Part A (i.e., Articles 2 through 10) of [the 1963 contract] (as amended, and as modified by the letter agreement dated December 14, 1971) is replaced by this interim renewal contract. The respective duties, covenants, and obligations of the parties in [the 1963 contract], as amended, which are not replaced by this interim renewal contract shall continue in full force and effect, pending prompt completion of good faith negotiations between the parties to agree upon an amendatory contract." |
| A559-97 | A566 | A596 |
| 2/28/2002 | 3/1/2002 – 2/28/2003 | "The terms and conditions of the Existing Interim Renewal Contract are hereby incorporated by reference into this Contract with the same force and effect as if they were included in full text with the exception of Article 2 thereof, which is revised as follows . . . ." |
| A600-02 | A601 | A601 |
| 2/14/2003 | 3/1/2003 – 2/29/2004 | "The terms and conditions of the Existing Interim Renewal Contract are hereby incorporated by reference into this Contract with the same force and effect as if they were included in full text with the exception of Article 1 thereof, which is revised as follows . . . ." |
| A608-10 | A602 | A609 |
| 2/27/2004 | 3/1/2004 – 2/28/2005 | (Same as above) |
| A614-16 | A616 | A615 |

In other words, the "respective duties, covenants, and obligations of the parties" that were not changed by the interim contracts continued "in full force and effect." Thus, plaintiff's obligation

to operate and maintain the conduit was not changed by the interim contracts. In fact, plaintiff's O&M obligation, which began in 1963, has never been terminated.

### c. The 2005 Long-Term Contract

In its May 17, 2017 decision, the court stated that on February 25, 2005, prior to the expiration of the last interim contract, the parties entered into a long-term contract whereby defendant agreed to provide plaintiff with water from March 1, 2005, to February 28, 2030. Clear Creek, 132 Fed. Cl. at 232-33. The court further stated: "Like the interim contracts, the 2005 long-term contract provides that, although Part A of the 1963 contract is no longer in effect, "[t]he respective duties, covenants, and obligations of the parties in [the 1963 contract] which are not replaced by this Contract shall be unaffected." Id. at 233. Although the court did not then identify those provisions within the 2005 long-term contract that replaced provisions within the 1963 contract, implicit in the court's decision was its conclusion that plaintiff's responsibility to operate and maintain the conduit remained unchanged by the terms of the 2005 long-term contract.

As noted above, plaintiff suggests that the court conflated the language in Article 35 of the interim contracts with the language in Article 39 of the 2005 long-term contract, thereby erroneously concluding that plaintiff's O&M obligation extended beyond February 28, 2005. Apparently, plaintiff contends that (1) because Article 39 of the 2005 long-term contract ends with the phrase "as if Part A [of the 1963 contract] had not been replaced," its obligation to operate and maintain the conduit under Part A of the 1963 contract ended on December 31, 1994, and (2) because the parties did not enter into any additional contracts following the expiration of the 2005 long-term contract, plaintiff's obligation to operate and maintain the conduit was once more defined by the terms of the 1963 contract. Plaintiff is incorrect. As stated by the court in its previous opinion, plaintiff's O&M obligation, as established in the 1963 contract, continues to this day; plaintiff cannot point to any language in either the 1963 contract, the nine interim contracts, or the 2005 long-term contract that provides otherwise.

### 2. The Fact That the Parties' Contract Continues in Perpetuity Does Not Violate Principles of Contract Formation or Interpretation

As explained above, in addition to arguing that the plain language of the various contracts does not support defendant's position that plaintiff's O&M obligation continues in perpetuity, plaintiff also argues that the very existence of such a contract violates (1) the contract formation principle of "certainty of essential terms," in that the duration of the contract is not stated; (2) the contract formation principle of "consideration," in that no value was given by defendant in exchange; and (3) the contract interpretation principle that the court should avoid irrational or absurd interpretations. Once more, plaintiff is incorrect.

First, as discussed in detail above, when the language of the 1963 contract, the 1994-2004 interim contracts, and the 2005 long-term contract are read in tandem, it is clear that the duration of plaintiff's O&M obligation is not ambiguous. Rather, it is clearly specified. Once plaintiff assumes responsibility for O&M of the conduit, that obligation continues, pursuant to Article 16 of the 1963 contract, until defendant—having determined that plaintiff has not properly operated

and maintained the conduit—provides plaintiff with timely notification that defendant plans to resume O&M of the conduit. Thus, with respect to plaintiff's argument regarding the contract's duration, clearly an essential term, plaintiff is mistaken. See Town of Readsboro v. Hoosac Tunnel & W.R. Co., 6 F.2d 733, 735 (2d Cir. 1925) ("Had the parties expressed the intention to make a promise for perpetual maintenance, we should, of course, have nothing to say; their words would be conclusive."); Fla. Keys Aqueduct Auth. v. United States, 7 Cl. Ct. 297, 300 (1985) ("[T]he fact that a contract is to have a perpetual term does not invalidate it . . . ."), aff'd, 790 F.2d 95 (Fed. Cir. 1986); see also Consumers Ice Co. v. United States, 201 Ct. Cl. 116, 125 (1973) ("The fact that a contract leaves indefinite the period for performance will not usually invalidate it or make it unenforceable, but the longer the period for performance the heavier the burden on the enforcing party to prove that the extended duration was intended.").

Second, "[a] contract does not lack mutuality merely because a particular promise or obligation is not offset by a similar promise or obligation. [Rather, t]he pertinent question is whether the agreement as a whole is supported by mutual consideration." Fla. Keys Aqueduct Auth., 7 Cl. Ct. at 299; see also 3 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 7:14 (4th ed. 2008) ("The fact that the obligations of parties to a contract need not be substantially equal may be demonstrated by the numerous cases in which one party to a contract has the right to reject a performance when that party, or someone acting on its behalf (such as an architect or engineer), is not satisfied, despite the fact that there is no corresponding right given to the other party. Other examples of unequal exchanges which nevertheless produce binding contracts abound, including the many cases involving contracts of employment which contain, in addition to the usual provisions covering services and compensation, a promise by the employee not to compete when the employment relationship comes to an end. Though equitable relief may not be available in all such cases, it will not be denied solely on the ground that values exchanged are not equivalent, or that the supposed requirement of mutuality of obligation has not been met."); 17A Am. Jur. 2d Contracts § 21 (2004) ("It has been held that there must be mutuality of obligation to form a contract or to render it enforceable, and mutuality of obligation is sometimes listed as an element required for the formation of a contract. However, it has also been held that the statement that mutuality of obligation is essential to every contract is too broad, and that 'mutuality of obligation' is the same as consideration, and that mutuality of obligation is unnecessary if the contract is supported by consideration. Also, it has been held that, because a promise by one person is merely one of the kinds of consideration that will support a promise by another, mutuality of obligation is not an essential element in a contract unless the lack of mutuality would leave one party without a valid or available consideration for his or her promise.").

In Florida Keys, the Florida Keys Aqueduct Authority ("FKAA"), "a state agency the purposes and functions of which are to obtain, supply, and distribute an adequate water supply for the Florida Keys," entered into a contract with the United States in 1974. 7 Cl. Ct. at 298. Pursuant to the terms of the contract, the United States agreed to transfer ownership of one of its pipelines to the FKAA. Id. In addition, the United States agreed to purchase its water from the FKAA for use by various federal agencies located in the Florida Keys. Id. In return, the FKAA agreed to charge the United States a reduced rate. Id. The contract further provided that the United States had the right to terminate the contract by giving notice to the FKAA after the passage of ten years. Id. at 299.

In its complaint, the FKAA claimed that its contract with the United States terminated in 1984 and that the FKAA was thereafter entitled to charge the United States the same rate it charged its other customers. Id. According to the FKAA, because the contract provided that only the United States was entitled to terminate the contract, "the portion of the contract which extends beyond the initial 10-year period is lacking with respect to mutuality of obligation and is therefore voidable under Florida law." Id. The court did not agree:

> In the instant case, the unilateral right of the government to terminate the contract upon notice after an initial 10-year term does not render the contract illusory by vitiating the government's consideration. First, the government transferred to FKAA the pipeline, appurtenant structures, and real estate used by FKAA to provide water service. Second, the government agreed to purchase and pay for water service at the rates provided in the contract for a minimum of 10 years, and in fact did do so. Third, the government agreed not to terminate FKAA's right to sell the water to the government at the agreed rates after the 10 years without giving plaintiff 30 days' written notice in advance. Thus, there was adequate consideration for the plaintiff's obligation to furnish water to the United States, and the right of the United States to terminate upon notice after 10 years does not render the contract illusory.

Id. at 300; accord Silverman v. United States, 230 Ct. Cl. 701, 711 (1982) ("As there is no indication of fraud or misrepresentation on the part of the plaintiff, the court is not concerned with the adequacy of the consideration furnished by the plaintiff." (citing Mills v. United States, 187 Ct. Cl. 696, 700-01 (1969))); cf. 2 Arthur L. Corbin, Corbin on Contracts § 5.12 (rev. ed. 1995) ("A single and undivided consideration may be bargained for and given as the agreed equivalent of one promise or of two promises or of many promises.").

As in Florida Keys, in the case at bar, consideration was given by both parties. For its part, defendant agreed to construct a conduit and a water distribution system, transfer O&M of both to plaintiff, and then provide plaintiff with water. See A220-71. In return, plaintiff agreed, inter alia, to operate and maintain the conduit upon its transfer. Id. Thus, plaintiff cannot claim that defendant failed to provide any consideration or value in return for plaintiff's ongoing obligation to operate and maintain the conduit.

Furthermore, plaintiff's mere assertion that a contract term that continues in perpetuity is either irrational, absurd, or both, does not make it so. This is especially true in this instance because there are definitive written terms defining the parties' obligations under the various contracts. In other words, this is not a situation in which plaintiff is attempting to convince the court that irrational or absurd terms govern the parties' relationship because there is no written contract. Here, there is not just one written contract, but many written contracts that define the parties' respective obligations.

Finally, the court rejects plaintiff's argument that because plaintiff was not obligated to reimburse defendant for the cost of constructing the conduit, it would not make sense for plaintiff to have agreed to operate and maintain the conduit in perpetuity. In this case, the consideration previously given was mutual; therefore, the terms of the various contracts will be upheld. That plaintiff now claims that the terms it previously agreed to make no sense is of no moment.

### 3. Plaintiff's Position Would Not Be Aided by the Court's Consideration of Extrinsic Evidence

Lastly, although plaintiff references extrinsic evidence in support of its contention that its O&M obligation does not continue in perpetuity, the parol evidence rule bars the use of such evidence in the manner plaintiff proposes. As stated by the court in <u>City of Tacoma v. United States</u>, 38 Fed. Cl. 582, 589 (1997):

> Contract interpretation may be aided, within limits, by an examination of the circumstances surrounding formation. The parol evidence rule bars the introduction of extrinsic evidence antecedent to or contemporaneous with contract formation for the purpose of adding to, subtracting from, varying, or contradicting the terms of a written contract, which is final[,] complete, unambiguous, and unaffected by mistake, fraud, or accident. <u>Conoco Inc. v. United States</u>, 35 Fed. Cl. 309, 325 (1996). The court, however, may use certain extrinsic evidence for the limited purpose of explaining the circumstances affecting a contract by shedding light on the parties' objective intent.

As discussed above, plaintiff contends that the introduction of parol evidence is permissible in this case because the meaning of the contract terms is ambiguous. However, plaintiff does not explain how it arrives at this conclusion. Instead, plaintiff merely states that where the language of a contract is susceptible to two reasonable interpretations, the language is ambiguous and therefore summary judgment is not appropriate. Pl.'s Reply 9.

The first piece of extrinsic evidence plaintiff offers is a statement made by the Assistant Regional Director of the BOR's Mid-Pacific Region concerning a separate dispute between plaintiff and Centerville Community Service District. <u>See</u> A850. In a letter dated May 25, 1989, the Assistant Regional Director stated: "At this time, we do not foresee a need for Reclamation to [operate and maintain] the Conduit in lieu of Clear Creek. It is expected that Clear Creek will continue to [operate and maintain] the Conduit through the term of their existing contract, that is through 1994." <u>Id.</u> Plaintiff contends that this statement is proof that its O&M obligation for the contract expired at the end of 1994. The court disagrees. As discussed above, the court finds that the express language of the various contracts is not ambiguous. Rather, the contractual language clearly mandates that plaintiff operate and maintain the conduit until such time as defendant: (1) concludes that plaintiff is no longer meeting its O&M obligation in a satisfactory manner, (2) notifies plaintiff in a timely fashion of its conclusion, and (3) resumes O&M of the conduit. Furthermore, even if the contractual language was ambiguous, because the Assistant Regional Director's statement contradicts rather than explains the terms of the contracts, it may

-18-

not be considered.  See TEG-Paradigm Envtl., Inc. v. United States, 465 F.3d 1329, 1341 (Fed. Cir. 2006) ("Given that the contract expressly incorporates certain extrinsic documents, but does not incorporate the work plan, we find that the work plan is an extrinsic document that cannot be used to contradict or modify the contract under the parol evidence rule."); W & F Bldg. Maint. Co. v. United States, 56 Fed. Cl. 62, 68 (2003) ("Having considered plaintiff's extrinsic evidence when ascertaining the completeness of the settlement agreement and modification, the court holds that plaintiff's extrinsic evidence is nevertheless prohibited by the parol evidence rule for the purpose of varying the unambiguous terms of the agreement.").

The second piece of extrinsic evidence plaintiff offers is the fact that the parties spent two days in the spring of 2004 negotiating plaintiff's O&M obligation for the conduit.  However, this evidence does not definitively establish, as plaintiff argues, that its O&M obligation for the conduit ended in December 1994 or that the parties would not have engaged in discussions if they believed that plaintiff's O&M obligation continued in perpetuity.  Unlike the Assistant Regional Director's statement, which contradicts the plain language of the contracts, the fact that the parties engaged in negotiations—in and of itself—does not contradict anything.  In other words, even if both parties agreed in 2004 that plaintiff's O&M obligation continued in perpetuity, they still could have sought to amend the contract.  Although plaintiff might argue that the fact that negotiations were held in 2004 explains the circumstances affecting the various contracts between the parties by shedding light on their objective intent, plaintiff would be mistaken.  It is equally plausible for the parties to have engaged in further negotiations regarding the operation and maintenance of the conduit following a previous agreement that plaintiff's O&M obligation had already expired (plaintiff's position) or a previous agreement that plaintiff's O&M obligation continued in perpetuity (defendant's position).

**4. Plaintiff's Claims Regarding Conduit Leaks Occurring in 2007 and 2011 Remain Viable**

In addition to maintaining the position that its O&M obligation expired on February 28, 2005, plaintiff argues that the court erred in concluding that plaintiff's claim regarding conduit leaks discovered in February 2007, August 2011, and September 2011 was untimely pursuant to the Tucker Act's six-year statute of limitations.  However, the court never reached such a conclusion.

In its Second Amended Complaint, plaintiff does not specifically reference leaks discovered in 2007 and 2011.  Rather, plaintiff broadly states that "[w]ithin the last six years, there have been interruptions in water service and breach of the CONTRACT by the United States' refusal to perform repairs and restore water service due to failures in the Muletown Conduit from a variety of causes."  Second Am. Compl. ¶ 33.  Similarly, in its motion to dismiss and for summary judgment, defendant did not specifically reference leaks discovered in 2007 and 2011.  Rather, defendant argued generally that plaintiff's claims of defective design and construction are time-barred; defendant's subsequent in-depth discussion of those claims focused on events that occurred prior to July 2004.  Def.'s Mot. to Dismiss & for Summ. J. 9-27.  Thus, in its response to defendant's motion to dismiss and for summary judgment, plaintiff stated:

> In regard to claims for damages from repairs of defective
> design/construction of the Conduit, it should be noted that Plaintiff

> claims damages for leaks in the Conduit at three separate locations and which occurred in February 2007, August 2011, and September 2011. A2592. The specific circumstances, location, causation, and other factors relating to each individual leak are not necessarily the same or otherwise identical as to the factors of causation. Defendant United States has not offered any objection or evidence asserting that individual leaks are identical in nature. All of these aforementioned leaks are well within the period of the statute of limitations and are not subject to any of the arguments made by Defendant on that alleged defense.

Pl.'s Resp. to Def.'s Mot. to Dismiss & for Summ. J. 8. In other words, as plaintiff correctly noted in its response, defendant did not addresses these three incidents in its motion to dismiss and for summary judgment. Because defendant did not address these incidents in its combined motion, the court did not rule on them in its May 17, 2017 decision. Thus, there is nothing for the court to reconsider; plaintiff's claims regarding conduit leaks occurring in 2007 and 2011 remain viable.

## IV. CONCLUSION

For the reasons stated above, the court **DENIES IN PART** (in Sections III.A, III.B, and III.C.1-3) and **DENIES AS MOOT IN PART** (in Section III.C.4) plaintiff's motion for reconsideration. The parties shall file a joint status report with a proposed pretrial and trial schedule <u>on or before Friday, January 19, 2018</u>. The proposed schedule shall include a suggested location (city and state) for trial and three suggested trial dates.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge